Call our third case for the morning and that would be Luann Tilwalk v. Prudentail. May it please your Honorable Court, I'm Carl Valen. I'm representing Luann Tilwalk. You know Luann was an employee of Reliant Energy, suffered a very terrible accident wherein a tree fell down and smashed her head like an eggshell. And as a result she went through numerous operations and finally got to a point where they had reconstructed the head as well as they could. And so the issue came down that she applied for total and permanent disability. Let me stop just a minute when we talk about total and permanent disability because the insurance company agrees with us that she's totally disabled. Total disability when we usually think about it is a vocational exercise. What can you do in relation to the job market? I mean what are your physical capabilities, mental capabilities, whatever. Permanent disability on the other hand is grounded in medical testimony or medical evidence if I should say, which tells you what can the body do under certain circumstances of the mind. What I want to bring to the court's attention here is in this entire area of the ERISA and the only way I can describe it is unfortunately the test which has been announced is a very, I think, found by district courts to be very confusing. But let me just say that I think the fundamental point in these cases that should be attended to is the continuum of circumstances that appears in the record. And when I say the continuum of exercise, I mean you can't go out and cherry pick certain statements that might appear here or there. What is it that this lady suffered if you find in the record? And what happened here is I think there's no issue that this lady never worked a day after that accident. Not ever. I think the other thing is that there's no question that she suffered extremely serious injuries including a closed head injury and one of her doctors saw that she had bleeding of the brain both at the subarachnoid and the subdural levels. And so what you got, you ended up with here is that the doctor that actually reconstructed the face in serial operations concluded she's going to have permanent double vision and a psychological problem. That's Dr. Cotone. That's correct. And Dr. Cotone's report is never really referred to in the assessment. Well, no it isn't. You talk about Dr. Lingle but not really Dr. Cotone. Well, this is part of that selective process that I think is offensive to the, let's say, the fair treatment of a person when you're going through the record. The problem that I have is that that doesn't stop there. They were cherry picking Dr. Lingle's assessment, that's a psychologist, because in the report they referred to he said, and you'll find this at record 47A, that she can't ever return to the job she was doing, not now or in the future. Now that, to me, tantamount to permanent disability. He also went on to say in that same report that due to the lapse of time, very little cognitive recovery is expected from this point. And I think that we all know that where we have neurological or injuries of the brain. Well, it says she'll not return to her job as a control room operator now or in the future. That's correct. That was her job. But then he went on to say even more. He said she can't, he said that there's very little cognitive recovery expected from this point. What's the date of the letter you're reading from? The date of that letter, Your Honor, was 03. The first one. The first one. And then he said, well, he's hopeful, and the way it was put is not a medical opinion, because he says, Charlie Tilwock, Luanne and I are hopeful she can return to the job market. Well, that's not a medical opinion. But he goes on to say that the residual cognitive impairments and recurrent exacerbation of depression and anxiety are preventing her from leading a fully independent life. And if you go through his report, you see where they're having troubles trying to regulate the medicine dealing with her psychological problems, because every time they get it adjusted, she falls off the cliff, so to speak, and you get to start all over again. The point about this is, and another area in this, is the Social Security judge hit the nail on the head because he dealt with medical evidence. He didn't deal with vocational evidence. He dealt with the medical evidence. He says, solely on the medical evidence, this lady has severe psychological and emotional limitations. Now, Prudential never even considered that. Never considered it. Finally, we got to the point where these serial denials, and by the way, if you look at denials, they're stereotypical in nature. If you go to the review by this doctor they had, which we don't know what he was. Kowalski. Kowalski. And Post made a point of that. Post said, remarked that there was no explanation what kind of a doctor this man was, what he did, what his specialty or lack of specialty or whatever it was. It was blank. But his was stereotypical also because he recites the things, and at the end he says that doesn't constitute permanent total disability. Well, he says, and I'm looking at the record, this is 534. It was 00400 of, I guess, the administrative record. He says, given the degree of cognitive impairment in 2001 and her activities at home in 2003, in my opinion, the medical records do not support that the cognitive impairment would not result in permanent total disability. Is there a typo there? There must be a typo, Judge. I don't know. I don't know. If there isn't a typo there, then they've got a real problem. I'm sorry to keep hitting this. All right. But, you know, you've got a real problem there. The problem that bothered me with this whole case is all the responses were stereotypical. What did the doctor do, this doctor? He went and recited what the testimony was, got to the end of it, and just said it doesn't constitute permanent total disability. No explanation. Let's talk about the scrutiny, the heightened arbitrary and capricious standard here. The district court seemed to say that there was very little in the record from which he could determine where on this scale it should be. I say, Judge. Is it up to the district court to figure that out in order to determine what standard, or is it up to one of the parties to deduce evidence that relates to the standard? And I know we haven't helped this situation. Let me get right to Post because Post sets it up, and then I think I want to go to Firestone because Firestone has a statement in it that I think nobody seems to have paid much attention to. The rule is that if an outside insurance company both funds and administers the benefit in an outside insurance policy, that constitutes substantial evidence of conflict of interest. It went on to say, furthermore, in Post, that if you don't have an independent review process, we're going to ratchet up this even more. And I added two other circumstances while mentioning, actually factoring into this structure argument, in that in this particular case, this lady was a former employee. So there was no constraint on this insurance company because of the relationship between employee-employer to be careful in its determination. Finally, and this is a little bit unusual, but in this particular case, the company for which she worked had been sold to a third party. And as a matter of fact, I want to call to the court's attention, record 491A, when they're talking about this, what had happened was the new company had pulled all this stuff back in-house away from Prudential, except for one, I guess it was this local, but that even that local had been forced to go back in-house, so to speak, leaving only the claims that were pre-1202, which this was one, left in the Prudential's responsibility. So you don't even really have an ongoing ERISA here. This is really just insurance. And clearly when you've got an insurance, they know about it. And what I'm saying is that what we gave here really ratcheted this thing way up. I want to call to my point is on paragraph 20 of my brief, Firestone talks about these as being actual evidence of this abuse of discretion. In other words, this evidence goes right to the abuse of discretion and not merely to the heightened standard. And I think that's very important because it talks about that this stuff will be weighted in the finding of abuse of discretion. So what Firestone is saying, this goes right directly to the core issue. Now the problem that I think we have, quite frankly, is this on this weighted, this sliding scale. Nobody knows what it means. Nobody knows what it means. In all due respect, if you go back to Pinot... Isn't there a few things that people don't understand? I know, but judge, I'm telling you, right when Pinot, the Pinot court said, our locution is wanting and it's kind of confusing. Well, then you go to Post. Post takes 35 pages to tell you what this thing's all about and ends up, and I suggest if you go, if you look at my letter brief, it says, really this whole thing comes down to a common sense determination. Like who's determined? How do you figure this thing out? Hey, district courts, Your Honor, I think you can attest to this. District courts understand abuse of discretion. They understand de novo. They know what that means. But when you get somewhere in between, what are they supposed to do? Well, Judge Becker used to talk about taking a hard look at something. And maybe that's where, maybe when you find these outside influences and lack of medical review process, maybe that's where we're supposed to take a hard look. I don't know. But maybe when he said that, that would just confuse it more. Well, let me say this to you. We all recognize that arbitrary and capricious is such a high standard that you're not going to overturn these determinations. So then the issue is, if it's not arbitrary and capricious and if there is self-interest here, how much do you chip away, if you will? Let me suggest a middle ground, which I've made in my brief. I believe, following Pinto, and if you look at Pinto, and I think I cite it in my brief, Pinto says you've got to get to the facts of the case, as which Post is saying. And the only way you get to the real facts of the case is to have at least a de novo analysis. And by that I mean, you use your own God-given intelligence to go into the record and find out what happened. Well, but facts don't mean de novo. Facts mean you look at all the facts. That's right. Then you decide, but then you have to apply a standard, whether you look at them anew as you would like or whether you look at them and see whether, given the facts, there was a sense of discretion. But remember, the structure already constitutes evidence of bias. Well, the district court didn't seem to think that there was enough evidence here of the relationship, and relegated the discussion to a footnote. Should we send this back to the district court and say... Let me tell you what, I agree with the dissent in Post. I think, first of all, this is like a social security. You've got a cold record here. You've got the plenary power or the law and the facts in this case. If you find bias and if you find from the continuum of this record that this lady is permanently disabled and that's the only issue before you, then you should reverse, enter judgment for her, and remand back her fees. Let me tell you one of the problems I have here is that, you know, this whole thing comes up by virtue of a summary judgment. I don't even know if summary judgment is appropriate because what you've got here is a cold record. It's really a judgment. I don't know what the exercise is. But what you really have here is you've got a cold record. You've got this standard of review you're dealing with. You've got all the evidence, by the way, that comes from the standard of review. And in this case, we've stipulated that this was an insurance company, an outside insurance company that both funded and administered the program. And they argued in that one count that the court ruled against me that I didn't appeal from, which was that I had joined the company and the district court said, well, the company doesn't have anything to do with it. It's the insurance company. I agree. It is. But what you've got here, I think what you have is here's where the district court, I think, got lost. You go in and look, for instance, at... I'll give you an example. Go in and look at how it treated the Social Security. First of all, the bias arises from ignoring it. So it's going to take upon itself to do the insurance company's job, and it's going to explain why this wasn't really a critical factor. But when it did it, it went on to... if you really look at its analysis, it did an analysis that there wasn't proof of total and permanent disability. Well, wait a minute. We already agreed total disability's out of the case. If you look at how it treated the Social Security, most of that had to do with vocational aspects, which is not an issue in this case. Let me ask a question. You seem to want us to decide or believe that we could reverse this outright on our own. But if this was resolved on summary judgment, which it was, and if what you're pointing out is there are factual issues about the permanence, then would we not send it back for trial? There is a... you can't have a trial. You cannot have a trial in ERISA. All right, but... It has to be on the record. It's on the record. It's a cold record. Unless it's de novo. Unless it's a de novo review, you cannot have additional evidence beyond that, which is in the record. Well, now, let me suggest, Judge, that there is some expansion of additional evidence that Post speaks to. And I think what that is is really what was the arrangement between the company and the insurance company as far as, you know, that sort of thing. Well, that's what I'm wondering. That's why I'm wondering, because the court, district court, dealt with it in a footnote, didn't really take it upon itself to figure out the facts necessary to determine what the standard should be. And to my mind, the district court would have to do that. Does the stipulation include that it was funded and administered by the insurance company? Yes, sir. And beyond that, I don't think there's any more information. I don't think you need any information. You see, I think that this is the point I made in my brief. From that structure is evidence requiring a heightened review. And then I said, I added three more circumstances that ratcheted even up higher. And for that reason, I think, really, here, if you go through and look, the thing that struck me the most about this was after the court entered summary judgment is what the court said. It went on to say, the court doesn't doubt the seriousness of this lady's injury. And from the evidence in this record, the court realizes that this lady is going to have severe limitations for the rest of her life. Can't amount to permanent? To me, it is. And I think it's what it said. But the court got hung up. It said, the court got in its mind, the court applied the abuse of discretion standard without any consideration of this heightened standard. That's what it did. And what it said, it said, this standard is so high, this abuse of discretion standard is so high, look about 2021, page 2021 of the opinion. You'll find that. And then I think it cut conscience stricken in the end and said, hey, wait a minute. You know, I'm saying this thing's way up here, but I agree, I agree this lady's been hurt bad, and I agree this lady's going to have problems the rest of her life. So I think you put this all together, I don't know how, and getting back to the point I made originally, in the continuum of this record, not taking, and I suggest to you, I cited a Third Circuit case, Kodak, that said, you look at the circumstances, and if you look at the circumstances of this case, I don't think reasonable people will disagree, this lady's hurt bad, she's got psychological problems, she's got emotional problems, and they're not getting any better. Thank you, counsel. Good morning. May it please the court, Salvatore Clemente on behalf of Acali, the Prudential Insurance Company of America. Clearly this lady is hurt bad, she's totally disabled. We're simply here today, is she totally and permanently disabled? Total disability is part of this case. She has to be totally disabled first, and then permanently disabled. And Judge Gibson got it right. He recognized that. He recognized that total and permanent disability is a tough standard to meet. However, it's further circumstances where someone, as Appellant put it in his brief, is a basket case. And that's what that's there for. We're dealing here, she's on total disability benefits. They were never denied. She was granted them. And there's just a simple issue here before you today concerning permanent disability. How do you explain the fact that Prudential never even mentioned Dr. Lingle's March 24, 2004 letter? The judge... Well, Prudential... The judge thought simply opined that they discounted it, but they never mentioned it at all. Well, Your Honor, if you look at the soap notes, Prudential received that letter. The what notes? The soap notes. Subjective, objective analysis and plan. That's when information comes in, they look at the information, and there's a claim to determination based upon the new information as it comes in. During the appeal process, like the Social Security Administration Award, that came in. All the information that comes in is analyzed. And that's just simply their term for doing that analysis of that information. That did come in, it's reflected in the administrative record that that letter came in, they looked at it, and when they analyzed that letter, there was no medical information in there, but basically Dr. Lingle saying, hey, you know, I lied. In essence, that's what he's saying. I didn't tell the truth, not only in my first report, which was a lengthy report, this was a one paragraph statement, I said hope, and he explained it away. But he didn't explain why in the questionnaire that Prudential sent out in September of 2003, when they flat out asked in the questionnaire, is she permanently disabled, he doesn't say yes. He says in two to three years, we won't know, and it remains to be determined. He didn't say yes. I don't think we'd be here today if he said yes in that questionnaire. But he didn't do that. Prudential's only looking at, I think Judge Gibson got it correct. He went through the entire medical record. Clearly this lady was injured. Clearly she was significantly injured. Clearly she's on total disability. Prudential agreed with the Social Security Administration. But here the test is, is she permanently disabled for the rest of her life? She's 45 years old, is she permanently disabled for the next 22 years? And we can't say that. But Prudential's determination here, the second denial, never refers to Dr. Cotone. And Dr. Cotone says that double vision and psychological problems will be permanent. If you have double vision, and the psychological problems referred to in here, you've got to hold a job. But Your Honor, in the initial denial letter, determination letter, Prudential did have that information and did, within that letter, it does say, these are the records we reviewed. As far as Dr. Cotone is concerned, he goes on to say that some of these, they're going to get better with time. But he doesn't know It says permanent. She's going to have these problems permanent for the rest of her life. But he doesn't say that they prevent her from working for the rest of her life. Now, there are many people who have had injuries who continue to work at any, not back at her own occupation, but at any occupation. She can continue to work. And it's just that at this point in time, with the record before the administrator, they weren't able to say that she's permanently disabled. Judge Gibson, when he analyzed this case, it was stipulated that it was a heightened scrutiny case because Prudential ensured the plan and made a determination on the claim. The funding issue, technically, the plan is always funded by the employer because they pay for the insurance. Now, of course, he goes into, in his footnote, he didn't realize there was no discovery concerning the business relationship between the employer and the insurer. But as Appellant points out, really that doesn't really matter at this point because the employer is no longer the employer. But what Judge Gibson does do, and what Post tells us to do, is to use, don't get bogged down on the scale of where we are on the scale. Don't get bogged down in that. Use common sense. That's what Post is telling us. And Post, and I think Judge Gibson, although he didn't have the benefit of Post before him, he did follow Post's mandate, which is what do you do first? Is there discretion over authority? Yes. It was stipulated to. Well, once there's discretionary authority, what's the standard? Is there any conflict? He made that analysis simply because we stipulated to it. Well, where on the scale does it fall? Then he goes into the procedural aspects. Those are the structural. He goes into the procedural aspects of what happened. Dr. Lingle, Dr. Lingle's letters, what Prudential did in its analysis of the letters. Dr. Catone and how Dr. Catone's statement, how reasonable minds could differ, the Social Security Administration Award, which was clearly, it's within the administrative record. It's referenced in the denial letter. And Judge Gibson got it right. He laid out exactly what the Social Security Administration did. It determined total disability, which Prudential agreed with. What we're dealing here with is permanent disability. Can we say that she's permanently disabled? And did Prudential abuse its discretion? And where Judge Gibson was on the scale, when he says even a minimal degree of deference owed to Prudential that they didn't act arbitrarily and capriciously. To me, that tells me that he's at the highest end, even at the highest end that... I'm sorry, Judge. What do we do with the Mitchell case? Mitchell v. Eastman Kodak, where we held the administrator acted arbitrarily and capriciously when it failed to credit a doctor's letter, saying there's no objective medical evidence, but it didn't treat a doctor's letter as sufficient medical evidence. Isn't that pretty on point and controlling here? Well, Judge, I think Black and Decker tells us from the Supreme Court that the attending physician role is not applicable in ERISA cases. Moreover, Mitchell, I believe, dealt with fibromyalgia, where there, the employer who was the plan administrator, I believe, Kodak, they denied the objective evidence. Well, that disease doesn't have objective evidence. It's all subjective complaints, ongoing complaints, depression, anxiety, and it fluctuates. And the court there found that because of that, how can you require, as an administrator, objective evidence when, for that particular disease, it doesn't exist? Well, how about psychological problems? I mean, double vision, there definitely is evidence of that objectively. What kind of... What objective evidence should there have been here that wasn't here? Well, we're not saying that there was objective evidence, Your Honor. No, I'm saying what would be more convincing than the doctor's statement that these problems are such that she's just never going to... Well, Your Honor, the appellant didn't provide... the doctor did say that, but the doctor went on to say that these problems are going to alleviate to some degree, but he doesn't know how much. Well, how about Dr. Lingle's second letter? The fault with that, according to Kowalski, was that it didn't provide an objective medical evidence. What objective medical evidence were you looking at? Well, Your Honor, well, it's not that objective. It's that all it was was a conclusory statement backpedaling. And when you look at Goodson, it tells us that, wait a minute, when you have... Why can't you have a doctor who's contradicting two prior statements? Now, all of a sudden, and why is he doing it? You have to ask yourself that. And Prudential had to ask themselves that question. And Judge Gibson asked himself that question. Why is he doing it? I don't think he's a liar, but when you say that, hey, the patient owns the record, I don't want to destroy her hope, well, basically, what is he there to do? He's there to treat her, and how can anyone in the future who's... if Dr. Lingle passes away, pulls out his records, how can anyone trust what he's saying if everything in his records is simply to give hope to his patients? I don't understand that. He's a psychologist. He's not a neuropsychologist. But I think really the telling factors here, Prudential asked him, is she permanently disabled? Now, am I wrong? The question I asked you before was Prudential didn't talk about it at all. The March 24th letter wasn't even mentioned, was it? By Prudential. Yes, it was, Your Honor, and it's in the... I don't know if it's in their conclusion. Well, what they did was they did not submit it to their medical reviewer, but they did reference it in the record itself, which is on page 553A. In the record, but I mean in their denial of the appeal, they didn't talk about it at all. Did they? The June 1, 2004? They referenced March... Yes, I think they did. Well, I guess that they haven't, but they didn't talk about it at all. The reviewer mentions it, but he doesn't... he seems to conclude that it's not objective medical evidence. He doesn't say that he discounts it, although Judge Gibson said that he did. Well, the fact of the matter is that there is no... Look at what he says. When I look at that letter, Your Honor, she was still treating with him for that past year. The initial letter came out in May. That following letter is, I believe, in March, or vice versa of the next year. If in that letter he would have said, well, ongoing over the past nine months, I've been treating her and she's not getting better. At this point, my position has changed. She's totally disabled. Totally and permanently disabled. He never says that. He just simply says, wait a minute. I said it. I basically thought she was going to get the record. I didn't want her to think that there was no hope. There is no hope. She's permanently disabled for the rest of her life from any job. Really, that's what it is. Is she disabled from any job? You've got to look at the contract language, and that's what it says. Well, I don't know that that's really an indictment of the doctor. I can totally understand that you have a patient who has psychological problems and is trying to get through the day. And that's why, Your Honor, she's on total disability. We agree. She's totally disabled. But the question is, is she permanent? It's kind of intuitive for him to say in connection with that assessment, oh, and by the way, there's no way this woman will ever work again. Really, that's what we're... And when it's clear that they need an assessment of whether it's permanent for a different purpose, he explains why he didn't put it in earlier and why he believes it. Why is that so? I mean, was the earlier... Was the earlier letter in connection with the regular Social Security application? Well, I believe it was, and it was addressed to the... It's interesting how... I find it interesting when I looked at this. The appeal letters all drafted by Ms. Howell, which were very well written, mind you, and she signs them. But all the documents submitted by the doctors all addressed to the attorney. I found that interesting how Ms. Howell can make well-reasoned appeals very... I think they're very well written, but still have a permanent disability. But that's not what Prudential looked at. I just saw that when I was reviewing the record. You know for a fact she wrote it as compared to... I don't know that. All I know is that she signed it. Okay, well, I mean... I don't know that. But she's represented. I wouldn't know why the attorney wouldn't simply do it. But in any event... Well... The fact of the matter remains, even if what you're saying, Your Honor, is the case, all it's doing is ratcheting up the level of scrutiny. And I think that Judge Gibson, he applied minimal... He just gave Prudential a minimal amount of deference, and he said, giving them a minimal amount... They don't have the classic factors in Koseba and Pinto that show a tendency to want to deny the claim. Here we're just dealing with a permanency. They didn't do anything to deny her claim for total disability. They recognized it and they still recognize it to this day. It's just that simple lump sum payment for the life insurance is simply... She doesn't meet it yet. And she didn't meet it under the record. Thank you. Thank you. Just a couple of points in rebuttal. When we talk about in the heightened standard of review that an insurance company both funds and administers the benefit plan, we're talking about that the money comes out of the insurance company's coffers to pay this lady. It's not being paid by the employer. The employer pays a set premium. Once the premium is paid, it's done. You know, from there on. Because if it was anything different, we wouldn't have this stipulation. The other thing, the point that I would make is that, first of all, I don't think, if you read our brief, that the March letter of Klingel is contradictory to the earlier one. I don't think it is. I think what it is, the earlier one, he said, hey, she can't do the job now or in the future. Hey, she's got she's got as good of psychological abilities as she's going to have. Now, then he goes on to say in the second one, hey, I find that she is totally and permanently disabled. Obviously, one can infer into that that he was continuing, there was this continuing relationship of doctor patient. So he was. They're right. He was seeing her. So, I mean, that can be inferred into that letter reasonably, it seems to me. I think the point about it is, and the idea I find rather curious, that they talk, well, treating physician doesn't apply in the ERISA. And it doesn't. But, hey, they're relying on the treating physician to defend this issue. Without him, they have nothing. Nothing in this record. And what I'm suggesting here is that what I suggest to you is this. Take all of the evidence in a continuum, which is what an insurance company should have done. And if you took that evidence in a continuum, you have a lady who was very fortunate to be alive, who had these terrific injuries to her head. And when you look at that, the district court had no problem in finding serious injuries and lifelong impacts to her ability to do various things from those injuries. And I think if I gave you, if I sat you down and said, let's forget about this case a minute, I'm going to give you a little fact circumstance here. What do you think? I think we all, as just people that have a limited amount of medical knowledge, would say, hey, this lady's going to be permanently totally disabled. We don't need some kind of a super expert to come in and tell us that. Thank you. Thank you, counsel. Case was well argued.